237407. The East Brooklyn Community High School is leaving you, sir. Hold on a second. Please proceed. Good morning, your honors, and may it please the court. My name is Mark Sigman, and I represent the plaintiffs. The district court below erred by concluding, first, that no reasonable self-published author could interpret the contractual term returns as my client and many other authors did, and second, by holding that there was no evidence of lack of good faith and fair dealing, particularly because Audible intentionally chose not to tell the authors about the number of returns, until, of course, the glitch happened that revealed what was going on here, and the surprise authors got up unarmed, and because, relatedly, Audible's dashboard actually used the term total sales, which clearly suggested that that was a total number, when in fact it wasn't. So let me start off with the term returns. The important thing to remember here is that the term must be interpreted in light of the industry usage of that word. We cited for that the Enri Debinger case from this court. You know, that court discussed the term common stock. I thought I understood what common stock was before I opened that case. It seemed like a pretty easy term to interpret, but it turns out that words have certain meanings in certain industries, and I would simply contend that, in this case, the word returns, in the self-publishing author industry, means a thing, a type of return, a type of thing that is reasonable in the industry and is not every single possible book coming back. That just seems an argument about return policies, which is not a term in the contract, and you're trying to kind of, you know, wedge that notion into the meaning of return, for which there is a plain meaning that doesn't incorporate the notion of whatever the underlying policy is. I understand that argument, and that's certainly what the district court held, Your Honor. I would just suggest that, I mean, words mean what we all agree them to mean, and, you know, I think that the fact of the outrage that existed here when the glitch happened, to me, is good evidence of the fact that lots of people did not interpret the word to mean that. The outrage, just to follow up on that point, the outrage was that they didn't understand how expansive the policy was. The outrage wasn't like we didn't understand what a return was, right? I mean, when people bring stuff back to a store, they return it, and they either get a refund or they get some kind of credit, right? Isn't that what the plain meaning of the word return is? The policy is different. It was definitely an expansive policy, but on the meaning of return, isn't that what a return is when you return the item you bought and you get a cash refund or you get some kind of credit or exchange? Two points, one less important, one more important. First, you know, I understand that that's what the district court held. I would simply urge that the fact that there was You quoted your expert, too, suggesting the same thing, right? Correct, and that is evidence that would be, you know, something on the other side of that summary judgment, but let me focus on Your Honor's second point, which is about returns versus exchange. I think that at a minimum, the court should reverse and say that the word returns does not include the word exchanges, and let me point to two pieces of evidence about that. First, Audible had another contract, and not the exact one at issue here, but one with the plaintiffs that used the word returns and exchanges. I mean, that suggests that returns and exchanges are different things. Now, Audible claims that's just mere redundancy, but you're supposed to give meaning to every term of the contract. And second, the district court on page SPA On that point, though, we have case law that says just because you could have been more precise in a contract doesn't mean that it's ambiguous, right? Yes, and there's other cases that say that you shouldn't read surplus age. I mean, like all these canons of statutory construction, there's always one on the other side. But second, I would point to on page SPA-9, the district court here itself held, quote, and it was citing an internal email from Audible that said Audible wanted, quote, customers to exchange one book for another instead of returning. They wanted an exchange instead of a return. I can't think of any language that is more one or the other than exchange. How do you define return? So, I mean, under, again, I would define it as we defined it principally in the brief, but under this essentially fallback argument, I would define a return as a, when you bring a book back and then you get back the type of money, either cash or credit, that you originally paid for it and not when you go and exchange it immediately for another item. I mean, to me, that's sort of the Adam minimal. So may I, Judge Bianco mentioned the expert, Mr. McElroy? Yes. And his definition, but maybe I misunderstood what you're saying, is in online retail, a digital product return is the process of a customer returning previously purchased digital content back to the retailer and in turn receiving a refund in the original form of payment, exchange for another item, or a store credit. And now, as I understood your response to Judge Bianco's question, you're walking away from that or this is your expert providing a definition that now on appeal does not behoove your position. Would you agree with that? I would acknowledge that, Your Honor. I would simply say that as, I mean, these are as a matter of law, the court held that it was not, it was unambiguous. I would simply hold up that. That is an evidentiary challenge that we would have on remand, and I acknowledge that. And that is a hard evidentiary challenge. But, I mean, again, if this court is not supposed to be looking. You said there's industry definitions that are different of return. So give me one. Give me one from anywhere, from any other company that defines return differently that's in the record. So to be precise, I'm not sure there's anything in the record about how another company specifically defined the word return. Like there's not like this company defined the word as X. What there is in the record is copious evidence of the fact that the return policy here was extremely broad and much broader than anyone else. That's Judge Nathan's point. The issue here contractually is what does the word return mean? You just told us there is no definition out there that contradicts the one that they're utilizing here, but that they have a broader policy. So you're really disputing the policy rather than the word return. And I understand that, which is why, I mean, today I would fall back to the argument that returns excuse exchanges. Your Honor's argument that you just made would not apply to that argument. And so I think at a minimum the court should hold that. Let me turn just briefly to the covenant of good faith and fair dealing claim. And, again, I mean, what actually happened in this case was that there was this glitch, and because before the glitch there was no one knew what the word, no one knew how many returns were happening. So people saw that they sold 80 books a month, and then one day it shows up and it says actually it was 100 minus 20 is 80. And that's why everyone got up in arms. And so the reason that Audible acted not in good faith here was simply by not reporting those numbers when it clearly could have. They point to the contract, which says they only have to report the net numbers. I read the provision. It seems to say that's what they're obligated to report, right? Yes, but the covenant of good fame is not inconsistent with that. I mean, by definition, a covenant of good faith claim imposes some obligation that's sort of ancillary or in addition to, but not contradictory to the contract. And so the contract, yes, requires payment of royalties on net sales, but requiring under good faith that Audible actually report how you get there, the math, the number of returns. They weren't hiding the policy. The policy was publicized and well-known. So why doesn't that cover it? I mean, I suppose an author might have wanted to, knowing that information available, might have wanted to contract or have that information in thinking about how to contract as to what that might look like in reality. But really at the end of the day, as you're saying, I think, this is a very generous return policy that impacted the royalties, and that was a known fact prior to the plaintiffs here entering into the contract. With respect, I think the evidence is highly disputed about whether that was a known fact. I mean, that's why people got up on arms. It was publicized. I mean, the wording of the contract was clear. People knew what that was, and people knew what the return policy was. But what there was a disputed issue of fact about is whether the author community out there understood that what was happening was that all of the returns under the broad general great list and guarantee policy were counting against them, which is why everyone got up on arms when it came out, when the numbers were first shown and ultimately led to a change and the Authors Guild came out and complained about it. There was, I think, some petition signed by more than 13,000 people about that. But focusing just on the covenant of good faith claim, just to sum up, I mean, the claim there is more narrow than the definition of return. The claim there is simply doesn't good faith at least require that you just tell people the number of returns? I mean, this is. So let me ask you about this issue because there's a second, as I understand it, under New York law, a second requirement that you've got to show damages. Is that right? Correct. Okay. And the damages have got to be rooted in the particular violation more or less. So here it's the alleged encouragement by audible of these returns. Is that also correct? No, Your Honor. So there's two bases for the good faith claim. The district court let the encouragement one go on to the end. And about that claim it held there was no damage evidence because you couldn't prove what returns were encouraged or not. I am not focusing on that argument today. I'm focusing on the other covenant of good faith and argument that the number of returns was hidden. About that, the damages would simply be very similar or arguably identical to the damages for the breach of contract. But aren't you limiting? Maybe I just misunderstood now your answer to my question. I thought you were limiting this concept of returns to encourage returns. No. So there's two theories for the covenant of good faith claim. Encourage returns. Encourage returns. And that's the one the court said there was no evidence of damages. I'm not focusing on that today.  You're moving away. Right. The second base, the one I am focusing on today is the first basis, which the court granted summary judgment on in the initial order. And it basically lumped it in with the breach of contract claim and said, look, because there's no breach of contract, there can be no claim that they acted in bad faith by not reporting the number of returns. That's the one I'm focusing on today. I don't think there's a damages issue there, at least not enough. No, that's a helpful clarification. You're moving away from the first one. I see I'm over. I'll reserve the rest. Thank you very much. You have one minute for rebuttal. We'll hear from counsel for our problem. Good morning, Your Honors. And may it please the court. I'm Jed Wakefield on behalf of Audible. Nothing the court has heard today changes the undisputed facts of this case, which established that Audible was entitled to summary judgment on both appellant's claims and that the district court properly excluded Mr.  I had planned to start with the breach of contract claim, then move to implied covenant and then address the Dalbert motion, but I'm happy to go in any. However, however you wish. I'll ask on breach. I'm just trying to think conceptually if there, if at some point what the policy is could become so expansive that it would start to interfere with the plain meaning of return. I'm sure you've tried to think of hypotheticals as well. I mean, something like the return policy is you can return it at any time and then you'll get credit and then five days later we'll, we'll give you the book back anyway, something like that. At some point, does the policy become so broad as to interrupt what the plain meaning of return is? I don't, I did think of hypotheticals, but I don't think that they would change the meaning of return under the contract. That might give rise to a completely different breach of the implied covenant claim. Unlike anything in this case, because that's just not in the record, but I think that it wouldn't create an ambiguity about returns. You could have a situation on the implied covenant where the return policy is so expansive and what's, I know he stepped away from the encouragement part of it, but that audible was encouraging people to just return them and get another one. It won't cost you anything because they were making money on the monthly fees and they could deprive the, you know, all the authors of the royalties and just collect a lot of monthly fees by having a very expansive policy. Couldn't that be a breach of the implied covenant? I, I don't think an expanse, I mean, if you're, if you're literally going to people who have no reason to know complained about a book are completely satisfied and encouraging and inducing them to return books, that would be a different set of facts, but it's certainly not the facts before the court. And there was no evidence that these named plaintiffs had any returns encouraged or induced by, by anyone that was the failure of proof on that implied covenant claim, but taking a step back to, to discuss return policies generally their own industry expert, Mr. McElroy, he tried to create a question about what return means, but he couldn't. And I think the court has already recognized that, but what he focused on is variations in return policies, but his report acknowledged that generous return policies and he cited study after study tend to increase net sales more than the number of returns, creating loyalty and satisfaction by customers. And this is why many successful and beloved retailers have these policies. And it made sense for audible to have such a policy when it's getting people to try audio books, which for many are new, it's a different experience than reading and trying, you know, try out a book. If you don't like this narrator, it's not right. You can, you can exchange it and get another. That was a well-known benefit of audible services from at the time, these named plaintiffs signed up. They argue in their brief that the breach of implied covenant requires that a party that has discretion under a contract, not behave irrationally or arbitrarily audible. Didn't its policy is absolutely rational. Reason for a consumer to keep an audible book after it has, after the purchaser has listened to it. Oh, I suppose the same reason we all might keep physical books as well. You can listen to it again on another trip. Someone else in your family can listen to it. You know, it's on the proverbial shelf and many people do. And most audible users keep their library of titles, which are even available after the end of your membership. And so, you know, there wasn't evidence here of, of just a massive abuse of this policy. There was evidence that audible took steps to curb abuse when it occurred. I think they would. The specific examples were very high numbers by a certain user would be and make it more difficult to every couple of months, right? Right. I mean the credit sale under a membership is one credit per month. So you'd have to actually go out and pay money and buy additional titles to have that many in, in, in any event, can you address the implied covenant claim that was focused on about concealing the gross sales? Yes. So as, as judge Furman correctly noted, that was an easily rejected claim because the contract expressly permitted deduction of returns from net from gross sales to calculate what were net sales. Now there's a new claim. We've heard in this appeal about concealment from the dashboard, which was a convenience feature, not contractually required, but a feature along with a help center and other features for ACX authors to see sort of a rolling rate of their sales. And that was not an argument raised below in the memorandum in opposition to our summary judgment motion. We think it's right. It's waived. The district court pointed out that it was mentioned, but not cited as a basis for their implied covenant claim. But I'd also point out the same help center that had this dashboard also explained to people why their numbers would go down on that dashboard because of returns. It wasn't concealed at all. It was made transparent to authors. Now there was a reaction when the author's guild sent out a letter and asked people to sign basically a petition asking audible to change its practices. That can't be evidence that creates an ambiguity. The letter itself accused audible of a breach and then said, would you like to tell them to stop and to get paid more money? That's not an organic groundswell or grassroots reaction. That's just a ginned up evidence. And if you could, if you could send a petition around accusing somebody of something, making, you know, inflammatory allegations, and then use that to overcome summary judgment as evidence, then there'd be no limit to what evidence is miscible. I'm just going back to the dashboard for a minute. So it was just a mistake when it classified it as gross sales as opposed to net sales. That was just to be clear. I know what the help, the help desk said, but there was some part of the dashboard that said gross sales. It didn't say gross sales. It said total sales. And it's referring to the total sales that generated returns. I mean that generated royalties, but it was actually the net. It was net because it was the total of their net sales that generated return of generated royalties. So it didn't make sense to show numbers that wouldn't generate any compensation under this agreement to the authors. It didn't say gross sales. You had mentioned, I'm just trying to understand the underlying process and the relationship between net sales and royalties. You'd mentioned that, and this makes business sense to me that when a company makes these returns possible, it builds loyalty and then your sales go up. Is that correct? Yes, that's, that's what the studies showed. And in fact, the evidence in this case showed that author royalties, both in the aggregate and on an individual basis went up over the period of, of this case. I understand that royalties increased after Audible changed the return policy and stopped encouraging returns. So how is that, am I missing something? So what the change was, was not just about encouragement. The change was about when payment would be made. Previously, any returned book would not generate a royalty. After the change in policy, any return after seven days from purchase Audible would eat that cost. It wasn't required to do that, but it did so. So of course, when it was no longer holding back money and was paying royalties, even when they weren't contractually required, that led to an increase in, in royalties, not a change in the return policy. And there was no evidence that. Out of the goodness of Audible's heart, it was paying these royalties, I will say that Audible is very focused on its listeners and it's off and the author community, and it takes in feedback and it does right by them. And it really does believe in that. So perhaps I should discuss Mr. Egan's exclusion briefly, unless you have other questions on contract. So they've argued that the problem with him, that he was excluded because there wasn't a calculation of total class-wide damages. That wasn't why he was excluded. He was excluded because he didn't measure the damages that appellants claim in this case. He simply counted all returns from a spreadsheet that Audible itself had produced. And this isn't a case where discovery was open. And this was simply a class certification issue where a party wants to put forward a model to measure, to show that damages are measurable across a class. This was the end of the case. Discovery was closed and we were on summary judgment. And it's also undisputed that there was never any claim by plaintiffs that Audible was missing any damages related information from what it produced. And that appellants never sought any relief from the district court saying they needed more information. They just didn't try. And Mr. Egan didn't try to connect his damages theory or his calculation to the actual claims of the case, which is that some, but not all, returns should not have been deducted. Do you understand him to be doing anything other than a calculation? No, Your Honor. He literally took a spreadsheet we produced in discovery and used the sum function, which anyone could do. Well, not me, but.  My law firm. Expertise is in the eye of the beholder, I'd say. Well, thank you very much. Thank you, Your Honor. We'll do some rebuttal. Thank you, Your Honor. Very briefly, number one, I'll rest on the briefs when it comes to Mr. Egan. We don't need him to have a reversal on summary judgment, though, which we made clear in the brief. So even if Egan remains excluded, I would still urge the court to reverse. Two, the dashboard did say total sales, not gross, but I mean, total to me is even more colloquial. It means total. As far as whether the argument was waived, it was raised in the fact section of the brief as the district court recognized and the district court actually addressed it. So I don't think there's any issue of a waiver there. Finally, there was an issue about the numbers. I think royalties and when the author's losses went up, they got rid of about two thirds of their losses after the policy was changed. So it was when the policy was changed, it was a significant, a significant benefit to the authors. I'm happy to answer any specific questions. Otherwise I will rest on the briefs. Thank you very much. We'll reserve decision. Very helpful.